# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PAUL KUSCHER,

        Plaintiff,

        v.

CME GROUP, INC,

        Defendant.

Case No. 22-cv-02640

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Paul Kuscher sues his former employer, CME Group, alleging the company discriminated against him due to his national origin, race, and gender and terminated him both due to his protected class and as retaliation for his internal discrimination complaints. He brings his suit under Title VII, 42 U.S.C. § 2000e, *et seq.* and the Illinois Human Rights Act, 775 ILL. COMP. STAT. 5/1 *et seq.* CME Group moves for summary judgment. [64]. For the reasons explained below, the Court grants Defendant's motion.

## I.    Background[1]

From November 9, 2015, to September 25, 2020, Chicago Mercantile Exchange ("CME") Group employed Kuscher, a male who identifies as majority Hispanic

---

[1] The following facts come from Defendant's Local Rule 56.1 statement of material facts, [65], Plaintiff's response, [77], Plaintiff's additional 56.1 statement of material facts, [78], and Defendant's response, [81], where supported. To the extent Defendant challenges Plaintiff's response and additional facts, the Court has discretion to apply the 56.1 rules "strictly or to overlook any transgression." *Waldrige v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 2004). The Court disregards any assertions that lack support in the record.

(specifically Puerto Rican), in the role of Manager for Technology Controls & Compliance in the Global Information Security ("GIS") department. [77] ¶¶ 1, 4, 8. From April 5, 2017, until Kuscher's termination, he reported to Allyson Zoller (Senior Director for Technology Controls & Compliance) who in turn reported to Daniel Manley (Managing Director and Chief Information Security Officer). *Id.* ¶¶ 9, 13. Kuscher received feedback that he met or exceeded expectations in the technical aspects of his role, even though his supervisors noted room for improvement in his interpersonal and communication skills. *See* [65-7] at 73–74, 80–81; [65-9] 29:9–21. Specifically, Kuscher's 2017, 2018, and 2019 mid- and end-year reviews, completed by Zoller, rated Kuscher as "On Target" and "Above Target" for all categories and received positive comments for "Leadership Competencies" and "Contributing to CME's culture and Employee Experience." [81] ¶ 25. Similarly, in his 2020 mid-year review by Zoller, Kuscher received "On Target" and "Above Target" for all categories; however, he received negative comments in "Contributing to CME's Culture and Employee Experience." *Id.* ¶ 29.

A few months before that mid-2020 evaluation, on February 11, 2020, Kuscher participated in a meeting. [77] ¶ 20. Subsequently, based upon complaints from the meeting participants, Zoller later told Human Resources ("HR") Director Christie O'Donnell that Kuscher exhibited bullying behavior and other misogynistic, disrespectful, condescending, and unprofessional conduct, particularly towards women. *See id.* ¶¶ 23–25. Kuscher met with Daniel Manley on March 6, 2020, where

2

they discussed both Zoller's treatment of him in response to the February 11 meeting and her management style generally. *Id.* ¶ 29. Then, on March 12, 2020, Kuscher complained to HR about Zoller's unfair treatment toward him (ostensibly, based on a separate incident). *Id.* ¶ 35. The following day, Kuscher completed an interview with HR in which he accused Zoller, among other things, of retaliating against him due to his March 6 meeting with Daniel Manley. *Id.* ¶¶ 36.

HR conducted two parallel investigations, one about Kuscher's alleged bullying conduct prior to and during the February 11 meeting, and a second regarding whether Zoller engaged in retaliation, discrimination, or a violation of any other CME Group policy. *Id.* ¶¶ 39, 40, 42. On April 21, 2020, HR closed its investigation into Kuscher's complaints about Zoller, concluding that it could not substantiate the discrimination and retaliation claims. *Id.* ¶ 46. HR could, however, find witnesses that "provided consistent negative feedback about Kuscher's conduct." *Id.* ¶¶ 41, 44.

Manley and Zoller met with Kuscher on June 10, 2020, and presented areas of potential improvement and shared specific training programs aimed to advance these goals. *Id.* ¶¶ 47–48. At this meeting, Kuscher accused Zoller of having made a racially and culturally inappropriate comment in a May 27, 2020, meeting in which Zoller said Kuscher's drum playing "sounded tribal." *Id.* ¶ 49. While speaking about Zoller's management style, Kuscher sounded emotional, and his volume increased. *Id.* ¶ 48. Zoller and Manley separately detailed this June 10 meeting for HR. *Id.* ¶ 51. Manley met with Kuscher on June 19, 2020, to discuss his conduct at the June

3

10 meeting, and he reiterated the sentiment in a July 7 email stating:

> I do not fault you for raising those concerns; however, the manner of how you addressed Allyson was unprofessional, confrontational and disrespectful. The way in which you spoke to her can't happen again with her or any other colleague. For the first time in the four years we have worked together, I witnessed your anger and loss of control in that meeting. This is the behavior and communication style that we have communicated to you is a problem and it can't continue. Failure to follow CME Group policies will result in further correction action, up to and including termination.

*Id.* ¶ 52. Kuscher responded to the email that it "was not the first time [Allyson's] behavior towards me has been escalated, and the behavior reached an apex when she crossed a racial line with me. The reason that this was the first time you witness this reaction, is because no one has ever crossed that line with me at work." *Id.* ¶ 53.

On July 7, Kuscher made additional complaints to the HR department, specifically Liz Francis, about Zoller, including the fact that Jennifer Sinars was promoted, he received more work after having other work taken away, and Zoller's "tribal" comment. *Id.* ¶¶ 54–56. Francis investigated Kuscher's concerns. *Id.* ¶ 57. For this investigation, Kuscher signed an Acknowledgement of Confidentiality in which he agreed to maintain confidentiality and refrain from discussing the investigation with others so that people may be encouraged to participate without fear of influence or retaliation. *Id.* ¶ 58. On July 2020, an anonymous complaint was submitted through CME Group's hotline similarly alleging that Zoller acted rude and condescendingly toward Kuscher; Francis incorporated this complaint into Kuscher's ongoing investigation. *Id.* ¶ 59. Ultimately, Francis's investigation found nothing to substantiate Kucher's claims about Zoller's racial conduct against him, or that Zoller

treated him differently from female managers in terms of work distribution or for promotion opportunities. *Id.* ¶¶ 64–65. Further, Francis found that witnesses reported Kuscher to be disrespectful toward Zoller, both in person and by speaking negatively about her to others, and witnesses also shared that they avoided meetings with Kuscher because they found him difficult to work with, rude, and condescending. *Id.* ¶ 66.

On July 13, 2020, Kuscher sent a zip drive to his personal email address. *Id.* ¶ 67. This zip drive contained his personnel file, performance reviews, personal notes and his resume, but, most critically, it also contained three folders of emails with confidential CME Group information. *Id.* The confidential emails included information about ongoing GIS projects, security standards, and details about other employees. *Id.* CME Group's Data Loss Prevention system detected the improper transfer of confidential material and, in response, quarantined the email account and its attachments. *Id.* ¶ 68. When attempting to take out the confidential information from his email, Kuscher worked with Ryan Whalen, director of GIS. *Id.* ¶ 68–70; [81] ¶ 18. Whalen identified the files causing the quarantine alert but stated the zip file could contain other confidential CME information. [77] ¶ 70–71. Whalen did not tell Kuscher he would release the quarantined email. *Id.* ¶ 71. Kuscher, on his own, removed the files identified by Whalen and tried to resend the other documents, but the system flagged again, and Whalen informed Kuscher a confidential file still existed in the email. *Id.* ¶ 72. After the second quarantine, HR reviewed the contents

5

of the zip drive and informed Kuscher which documents contained confidential and sensitive information. *Id.* ¶ 73. Kuscher removed the identified files and sent the permitted files to his personal email without triggering another quarantine alert. *Id.* ¶ 74.

Three weeks later, on August 4, 2020, Kuscher attempted to send another email to his personal email address again with a zip drive containing the same confidential emails he had previously attempted to send to himself, as well as additional confidential and sensitive CME Group emails. *Id.* ¶ 76. The system detected and quarantined Kuscher's email and attachments. *Id.* ¶ 77. Christie O'Donnell of HR investigated these quarantined email events and interviewed Kuscher—he admitted that CME Group policy did not allow him to send any confidential CME information to his personal email address. *Id.* ¶¶ 79, 80, 82. While Kuscher claimed that he accidentally included the confidential emails in the attached zip drive, O'Donnell did not find Kusher's explanation to be credible. *Id.* ¶ 83. Kuscher's third attempt to send confidential emails could have resulted in his immediate termination, but Manley issued him a warning instead, which stated: "Please understand that further violations of CME Group policies or attempts to circumvent preventative security measures will not be tolerated, regardless of your stated intent." *Id.* ¶ 84.

Liz Francis from HR met with Kuscher on September 17, 2020, to close out the second investigation regarding Kuscher's complaints against Zoller. *Id.* ¶ 85. Francis

6

shared that the investigation found no support for Kuscher's claims against Zoller. *Id.* ¶ 86. At the end of the meeting, Francis reminded Kuscher of his obligation to maintain confidentiality, to refrain from discussing the investigation, and that CME had a zero-tolerance policy against retaliation. *Id.* ¶ 87. Immediately after the meeting ended, at 2:43 p.m., Francis emailed Kuscher an Investigation Close Out Memorandum. *Id.* Four minutes later, at approximately 2:47 p.m., Kuscher called two individuals (consultants whose work he regularly reviewed), and asked whether they participated in the investigation; they had. *Id.* ¶ 88, 90–91. The individuals reported Kuscher's improper calls to HR. *Id.* ¶ 89. When Francis reached Kuscher by phone the next morning, he admitted to contacting the two participants. *Id.* ¶ 92.

Shortly after this incident, on September 25, 2020, Manley decided to terminate Kuscher. [65-11] 86:13–19, 87:5–12. Manley stated the reason was because he "was no longer confident" in his "ability to trust Paul [Kuscher] to be more precise" and that he "didn't trust Paul's judgment and his ability to perform in his job responsibility given the violation of policies." *Id.* 87:5–12.

Following his termination, Kuscher made more accusations about Zoller, including her behavior toward him and general derogatory statements she allegedly made about men. *See* [66] at 16; [77] ¶ 98, 101. Kuscher also claimed Zoller criticized his voice in a racially defamatory way, [77] ¶¶ 99, 100, and she stated: "You know how Latins are," *id.* ¶ 101.

CME Group has moved for summary judgment. [64]. Instead of presenting its

arguments in a typical response brief, Kuscher responded to CME Group's memorandum through answers to CME Group's Rule 56.1 Statement of Additional Material Facts. [77], [80]. CME Group replied in memorandum form. [82]

## II.     Legal Standard

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, a court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020).

The party seeking summary judgment carries the burden of establishing that no genuine dispute as to any material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this initial responsibility, the non-moving party must present some evidence that creates an issue of fact to survive summary judgment. *Hutchison v. Fitzgerald Equip. Co.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" supporting the non-movant's

8

position does not suffice; there must exist some evidence which would allow a jury to reasonably find for the non-moving party. *Anderson*, 477 U.S. at 252. For an employment discrimination suit, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *Davis v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (citing *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013)).

## III. Discussion

### A. Discrimination Claim

Kuscher claims that CME Group discriminated against him based upon his national origin, race, and gender during his employment and when it terminated him, violating Title VII and the Illinois Human Rights Act ("IHRA"). Because the analytical framework for Title VII and the IHRA are "essentially identical," this Court addresses the two causes of actions together. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016); *see also Volling v. Kurtz Paramedic Servs. Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that "Illinois courts apply the federal Title VII framework to IHRA claims").

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To succeed on a Title VII discrimination claim, an employee

must prove: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; and (3) causation. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (citing *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018)).

In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), the Seventh Circuit clarified the methods of proof in employment discrimination cases. The court explicitly instructed district courts to consider the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself" whether it be 'direct' or 'indirect' evidence. *Ortiz*, 834 F.3d at 765. The holistic analysis set forth in *Ortiz* supplements, rather than alters, the burden-shifting framework for discrimination claims that the Supreme Court created in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). *See Davis*, 846 F.3d at 224 (discussing *Ortiz*'s impact on methods of proof in employment discrimination cases).

Courts now conduct the *McDonnell Douglas* analysis if the parties present arguments "in those terms," but also assess the plaintiff's evidence "cumulatively" under *Ortiz*. *See id.* Here, the parties do organize their arguments utilizing the *McDonnell Douglas* framework. Accordingly, the Court will first assess the evidence in accordance with the *McDonnell Douglas* framework and determine whether Kuscher has established a *prima facie* case of discrimination. Then, the Court will review the record holistically, asking whether it permits a reasonable factfinder to conclude that CME Group discriminated or terminated Kuscher based on his national origin, race, or gender.

10

### 1. Plaintiff's Claim Under *McDonnell Douglas*

*McDonnell Douglas* requires a plaintiff to state a *prima facie* case of discrimination by showing that: (1) he belongs to a protected class; (2) he performed reasonably on the job in accordance with the defendant's legitimate expectations; (3) despite his reasonable performance, he was subjected to an adverse employment action; and (4) similarly situated employees outside of his protected class received more favorable treatment from the defendant. *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 824 F.3d at 765. Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to offer "a legitimate, nondiscriminatory reason for the employee's termination." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). If the employer does so, the employer merits summary judgment "unless the plaintiff presents evidence that the proffered reasons are pretexts for discrimination." *Collier v. Budd Co.*, 66 F.3d 886, 889 (7th Cir. 1995).

Kuscher cannot make out the *prima facie* case. Namely, he cannot prove the second element: meeting CME Group's legitimate expectations. Also, as to the fourth element, he fails to properly identify a single similarly situated employee that Defendant treated more favorably.

First, Kuscher's claim fails because he fails to even argue that he met CME Group's legitimate expectations, or to otherwise present an appropriate comparator. *See generally* [77], [80]. Kuscher thus waives both issues. *Braun v. Vill. of Palatine,*

11

56 F.4th 542, 553 (7th Cir. 2022) ("A litigant 'waives an argument by failing to make it before the district court.' This rule applies when 'a party fails to develop arguments related to a discrete issue' . . . .") (first quoting *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011); and then citing *Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005) (finding waiver because the party "did not present legal arguments or cite relevant authority to substantiate" his claim)); *see also U.S. v. Useni*, 516 F.3d 634, 658 (7th Cir. 2008) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.") (quoting *Sere v. Bd. of Trs. of Univ. of Ill.*, 852 F.2d 285, 287 (7th Cir. 1988)); *see also Gross v. Town of Cicero.*, 619 F.3d 697, 702 (7th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in [the record].") (quoting *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

Even if Kuscher properly developed these arguments, however, the factual record still undermines his case under both the second and fourth prongs of the *McDonnell Douglas* test. Concerning the second prong, CME Group informed Kuscher multiple times that he did not meet their expectations. For example, Manley and Zoller conducted a meeting with Kuscher on June 10 to address his unprofessional communication style. After Kuscher displayed that same communication style at that meeting, Manley wrote Kuscher directly, stating: "This is the behavior and communication style that we have communicated to you is a problem and it can't continue. Failure to follow CME Group policies will result in

12

further correction action, up to and including termination." Next, Kuscher repeatedly attempted to improperly send confidential company information to his personal email; and Manley warned Kuscher that "further violations of CME Group policies or attempts to circumvent preventative security measures will not be tolerated, regardless of your stated intent." Likewise, after the conclusion of the final HR investigation conducted by Liz Francis, she explicitly reminded Kuscher about CME Group's policy on investigations and contacting potential participants, but Kuscher disregarded these warnings and improperly contacted participants of the investigation to find out if they had, in fact, participated in the HR inquiry. Finally, the record confirms that numerous other employees complained about Kuscher's bullying and misogynistic behavior at the workplace to the point that it reflected on his performance review. In short, given the record, Kuscher cannot show that he met CME Group's legitimate expectations.

Concerning the fourth prong of the test, Kuscher fails to identify an adequate comparator. The similarly situated analysis "calls for a 'flexible, common-sense' examination of all relevant factors." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quoting *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007)). An analysis such as this eliminates "other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Id.* (internal quotation omitted). Thus, while similarly situated employees need not be identical in every conceivable

13

way to the plaintiff, they "must be directly comparable to the plaintiff in all material respects." *Id.* (internal quotation omitted). In other words, there must be "enough common factors . . . to allow for a meaningful comparison in order to divine whether discrimination was at play." *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007). The Seventh Circuit has held that to allow for this meaningful comparison, a typical *McDonnell Douglas* plaintiff must show, at a minimum, that the comparators: "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman*, 667 F.3d at 847 (internal quotations omitted).

Here, Kuscher fails to meet the standard articulated in *Coleman* as he does not identify any comparator employee, and thus, he fails to give this Court any opportunity to conduct the "meaningful comparison" for age or national original as required in *Barricks*. 481 F.3d at 560.[2] Therefore, Kuscher fails to establish a *prima facie* case of discrimination, and his claim cannot proceed under *McDonnell Douglas*.

---

[2] To be sure, Kuscher complains of the potential preferential treatment of Jennifer Sinars, but this complaint is not enough. Kiernan Moran, another employee, agreed with this sentiment but believed that Zoller treated Sinars favorably to everyone else on the team, male and female alike. [77] ¶ 102. Moreover, evidence of common supervision is not enough. *See Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 898−99 (7th Cir. 2018) (finding a comparator was not similarly situated because "the only evidence that the plaintiff and [comparator] were similarly situated is that they shared the same supervisor" and the Court had no idea whether she "was otherwise similarly situated, or whether there were any unusual circumstances, mitigating factors, difference in seniority, that would have made the comparison inapt."). Without additional information about Sinars or any other individual's behavior or treatment at work, the Court can make no "meaningful comparison" for Kuscher's race, national origin, nor sex discrimination claim.

### 2. Plaintiff's claim under *Ortiz*

Kuscher's claim also fails under *Ortiz*'s holistic approach. Under *Ortiz*, this Court must assess Kuscher's evidence cumulatively and determine whether it would permit "a reasonable factfinder to conclude" that his age or national origin "caused the discharge or other adverse employment action." 834 F.3d at 765; *Davis*, 846 F.3d at 224. This record, considered as a whole, does not.

Kuscher argues that but for his race, national origin, or gender, he would not have been terminated. Yet, the record confirms that Kuscher repeatedly violated company policies, leading to meetings and warnings. Indeed, Kuscher violated three completely different types of CME policy: workplace professionalism, which occurred over a period of time and affected multiple people; attempted breach of confidential information, which he committed three times; and improper contact with witnesses of an HR investigation. It was only after the last violation that Manley terminated Kuscher, writing that he didn't feel he could trust Kuscher's judgment or his ability to perform his job anymore.

Additionally, any supposed discrimination by Zoller does not support Kuscher's claim. Zoller indisputably did not make any of the decisions to discipline or terminate Kuscher. [66] at 4–5. Under *Ortiz*, at the "end of the day, the question is simply whether the same events would have transpired if plaintiff had been younger than 40 [or of a different race, sex, and national origin] and everything else had been the same." *Skiba v. Ill. Cent. R.R Co.*, 884 F.3d 708, 725 (7th Cir. 2018) (internal

15

quotation omitted).  Considering the evidence as a whole, the answer is yes.  There is no evidence to suggest his national origin, race, or gender played a role in these decisions, and Kuscher's claim likewise fails under *Ortiz.*

## B. Retaliation Claim

Title VII prohibits an employer from retaliating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."  42 U.S.C. § 2000e-3(a).

To defeat summary judgment, a plaintiff must offer evidence from which a reasonable jury could find that: (1) she engaged in an activity protected by the statute; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.  *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022); *see also Volling*, 840 F.3d at 383 (noting that the Title VII retaliation framework applies with equal measure to IHRA claims).[3]  The relevant question is: "'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused' the materially adverse action?"  *Lesiv,* 39 F.4th at 911 (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)).  When evaluating this question, relevant evidence may include "suspicious timing, ambiguous statements of animus, evidence other

---

[3] Retaliation claims may proceed under direct or indirect methods of proof. *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). The indirect method, however, mirrors the *McDonnell Douglas* framework for discrimination, only asking if the plaintiff engaged in a statutorily protected activity rather than if she fit within a protected class. *Id.* Because Kuscher fails to show he met legitimate expectations or that he was treated differently than someone similarly situated, the indirect method would also fail.

16

employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Alley v. Penguin Random House*, 62 F.4th 358, 361 (7th Cir. 2023) (quoting *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019)). Like Plaintiff's discrimination claim, his retaliation claim "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Lesiv*, 39 F.4th at 911 (citing *Ortiz*, 834 F.3d at 765).

An employee engages in a protected activity when he opposes an unlawful employment practice. *Alley*, 62 F.4th at 362. Employment discrimination constitutes an unlawful employment practice, so reporting allegations of discrimination is recognized as a protected activity under Title VII. *See id.*; *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015). And termination is, of course, a materially adverse employment action. *Castro*, 786 F.3d at 564. So, the only question that remains is whether there existed a causal link between the protected activity and the adverse action. Kuscher asserts that the "decision to discriminate against Plaintiff was solely motivated by the fact that he reported discrimination." [14] ¶¶ 66–67, 98. CME Group responds that Kuscher cannot prove as a matter of law that but for his complaints about Zoller he would not have been terminated. [66] at 14.

Based upon the record, Plaintiff has failed to establish the requisite causal link between the alleged protected activity and the adverse action taken. *See Lesiv*, 39 F.4th at 911. In March and July, Kuscher made complaints to HR about Zoller, which opened two separate investigations. HR conducted the investigations and could not

17

substantiate Kuscher's claims. The alleged retaliation occurred months after his first protected activity: reporting Zoller for alleged discriminatory behavior. At the close of the second investigation, Kuscher impermissibly contacted participants. Within days, Manley, not Zoller, terminated him, citing this policy violation. Plaintiff failed to offer evidence from which a reasonable jury could conclude that CME Group terminated Kuscher because he complained about Zoller. Thus, Plaintiff's retaliation claim fails.

## C. Harassment Claim

CME Group argues Kuscher's harassment claim cannot survive summary judgment because: (1) most of the alleged harassment does not relate to his gender, race, or national origin; (2) it is untimely; and (3) it does not rise to the level of severe or pervasive harassment, constituting a hostile work environment. [66] at 1–2. Here, Kuscher fails to develop an argument supporting his harassment claim, and thus, he waives the issue; and record also otherwise supports granting summary judgment in favor of CME Group.

For a harassment claim, the law requires Kuscher to present some evidence showing he worked in a hostile environment in which: (1) he was subject to unwelcome harassment; (2) the harassment was based on his protected class; (3) the harassment "was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment"; and (4) a basis for employer liability exists. *E.E.O.C. v. Vill. at Hamilton Pointe LLC*, 102 F.4th 387, 401 (7th Cir.

18

2024). While several deficiencies exist, this Court need only address the third element, because Plaintiff fails to demonstrate the harassment he faced was "so severe or pervasive."

When determining whether harassment rises to the level of being "so severe or pervasive," courts employ both an objective and subjective test. *Id.* For the objective test, courts look at the totality of the circumstances, including: the conduct's frequency, its severity, whether it physically threatened or humiliated the employee (or merely were offensive utterances), and whether it unreasonably interfered with the employee's work performance. *Id.* at 401–02. While a workplace need not be "hellish," it does need to be "so pervaded by discrimination that the terms and conditions of employment are altered." *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (first quoting *Jackson v. Cnty. of Racine*, 474 F.3d 493, 500 (7th Cir. 2007); and then citing *Vance v. Ball State Univ.* 570 U.S. 421, 427 (2013)). Courts also consider "the relationship between the harassing party and the harassed." *Robinson v. Sappington*, 351 F.3d 317, 330 (7th Cir. 2003).

A court will not find a work environment to be hostile "for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not threatening or humiliating." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011); *Passananti v. Cook Cnty.*, 689 F.3d 655, 667 (7th Cir. 2012) ("Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment."). Specific instances may create

19

a hostile if they are so severe, and unambiguously racial epithets fall on the "more severe" end of the spectrum. *See Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950–51 (7th Cir. 2005).

At worst, the briefing reveals that once Zoller referred to him as "tribal," expressed her dislike of the idea of eating Puerto Rican food, and said "you know how Latins are." [77] ¶¶ 38, 49, 101. Zoller also, prior to 2019, complained about "f-cking, cheating men," *id.* ¶ 98, and Zoller allegedly made potentially coded statements, such as saying Kuscher's "East Coast/New York was showing" and calling him "too passionate." *See id.* ¶¶ 19, 99–100. Even as alleged, the record confirms that these comments occurred infrequently over the three years Zoller supervised Kuscher, and the purported statements did not objectively threaten or demean him. Nor were the statements so patently offensive, such as a racial epithet. *See Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) (finding that, even while racial epithets are 'severe,' "the one-time use . . . is not severe enough to trigger liability"). Kuscher also makes no allegations (or presents evidence) that this treatment interfered with the performance of his duties. All these factors taken together do not establish an objectively hostile working environment. Therefore, this claim fails.

For these reasons, this Court grants summary judgment to Defendant on all counts.

20

## III.    Conclusion

For the reasons explained above, the Court grants Defendant's motion for summary judgment [64].  The Clerk shall enter judgment for Defendant and against Plaintiff.  All dates and deadlines are stricken.  Civil case terminated.

Dated: March 27, 2026

Entered:

John Robert Blakey
United States District Judge